PEOPLE v MACK

Docket No. 110424. Submitted November 6, 1990, at Detroit. Decided June 18, 1991, at 9:10 A.M.

Jesse J. Mack was convicted following a jury trial in the Detroit Recorder's Court of four counts of first-degree murder, two counts of second-degree murder, and one count of possession of a firearm during the commission of a felony. The charges arose out of the slayings of three people. Before sentencing, the court, Clarice Jobes, J., vacated two of the first-degree murder convictions and one of the second-degree murder convictions. The defendant appealed, raising several issues.

The Court of Appeals *held:*

1. The court did not abuse its discretion in denying the defendant's motion for substitution of counsel, which was not supported by a showing of good cause. The court also did not err in allowing the defendant to represent himself at trial. The defendant knowingly, intelligently, and voluntarily waived his right to representation.

2. The court did not err in finding the defendant's confession to have been voluntarily made and in admitting it as evidence.

3. Allegedly improper remarks by the prosecutor did not rise to the level of impropriety necessitating reversal. Any alleged prejudice resulting from the remarks was cured by the court's instructions.

4. The defendant was not denied his Sixth Amendment right to legal assistance when he was not allowed access to a law library. The state is not required to offer a defendant access to a law library once it has fulfilled its constitutional obligation to provide him with competent legal assistance. The court satisfied its obligation under the Sixth and Fourteenth Amendments when it offered the defendant the assistance of counsel, which he declined. The defendant was not deprived of all avenues of meaningful access to the court.

5. The jury verdict was not inconsistent and indicated that

REFERENCES

Am Jur 2d, Criminal Law §§ 551, 993-995, 1006.

See the Index to Annotations under Homicide; Lawbooks; Law Libraries; Sentence and Punishment.

the jury was not confused by the court's instructions. The court properly vacated two of the first-degree murder convictions and one of the second-degree murder convictions. Absent a legal or logical inconsistency, being convicted of two separate charges of murder for the killing of one person, i.e., first-degree premeditated murder and felony murder, does not constitute error requiring reversal as long as sentencing is properly imposed for only one of the convictions.

Affirmed.

1. CRIMINAL LAW — CONSTITUTIONAL LAW — LEGAL ASSISTANCE — LAW LIBRARIES.

A state is not required to offer a defendant access to a law library once it has fulfilled its constitutional obligation to provide competent legal assistance (US Const, Ams VI, XIV; Const 1963, art 1, § 20).

2. HOMICIDE — MULTIPLE CONVICTIONS FOR SINGLE KILLINGS — SENTENCES.

Absent a legal or logical inconsistency, being convicted of two separate charges of murder for the killing of one person does not constitute error requiring reversal as long as sentencing is properly imposed for only one of the convictions.

*Frank J. Kelley*, Attorney General, *Gay Secor Hardy*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Reilly Wilson*, Assistant Prosecuting Attorney, for the people.

*Chodak & Robiner* (by *Norman R. Robiner*), for the defendant on appeal.

Before: REILLY, P.J., and WAHLS and DOCTOROFF, JJ.

PER CURIAM. On June 15, 1988, following a jury trial in the Detroit Recorder's Court, defendant was convicted of two counts of second-degree murder, MCL 750.317; MSA 28.549; four counts of first-degree murder, MCL 750.316; MSA 28.548; and one count of possession of a firearm during the

commission of a felony, MCL 750.227b; MSA 28.424(2).[1] Before sentencing, the trial court vacated two of the first-degree murder convictions and one of the second-degree murder convictions. On July 1, 1988, defendant was sentenced to a term of life in prison without parole for the first-degree murder convictions, twenty to fifty years in prison for the second-degree murder conviction, and two years for the felony-firearm conviction. We affirm.

On March 12, 1988, at approximately 3:00 A.M., Nathaniel Wrice was awakened by the sound of voices outside his Detroit residence. Subsequently, the witness heard six gunshots. Startled, Wrice arose and looked out his front door, where he observed a body lying in the street approximately one foot from the curb. Lucinda Jones, a neighbor, also heard the voices, followed by gunshots, and immediately thereafter observed a car speeding away from the area. The police were called and arrived approximately twenty minutes later. The first officer on the scene observed the gunshot victim, later identified as William Aaron Rice, Jr., age thirty-two, lying in the street with a wound to the left side of his head. The victim was pronounced dead at the scene. According to the medical examiner, Mr. Rice, who was shot six times, died of multiple gunshots wounds, fired from close range.

At approximately 4:45 A.M., also on March 12, 1988, Haymon Jones was returning to his Detroit home when he observed a woman lying partially in the street and partially on a lawn. The witness telephoned the police, who arrived shortly thereafter. The first officer on the scene observed that the

---

[1] Defendant was charged in the information with two counts of first-degree murder (premeditated and felony murder arising from the charged underlying felonies of kidnapping or criminal sexual conduct) in the death of each victim for a total of six counts.

woman, later identified as Jacqueline Rice, age thirty-two, was lying in a pool of blood. The victim, who was the wife of William Aaron Rice, Jr., was transported to Mt. Carmel Mercy Hospital, where she later died. According to the medical examiner, Mrs. Rice died as the result of sustaining a single gunshot wound to the chest.

Investigating officers Browner and Harvee of the Detroit Police Department went to the decedents' address, a two-story flat located on Roselawn Street. The door to the upper flat, where the Rice family resided, was standing wide open. The officers entered and discovered three-year-old William Rice, III, asleep, untouched, and unharmed. It appeared that a card game had been in progress and there were no signs of a struggle, or that the home had been ransacked or burglarized. The home was dusted for fingerprints, and prints belonging to the decedents and defendant were found on several vodka bottles and drinking glasses.

On March 13, 1988, at approximately 5:30 P.M., Arthur Mitchell was walking home when he observed the body of a young girl with pink curlers in her hair lying in the street. The body was wrapped in what appeared to be a bedspread. The police, who were immediately summoned to the area, observed that the girl, later identified as Tameka Rice, age eleven, was nude and her mouth was stuffed with a nylon and bound with tape. The victim was pronounced dead at the scene.

Through laser technology, hair and fiber samples were collected from Tameka's body. The laser also revealed a hand print on the victim's inner thigh and a smeared substance on her groin and buttocks areas. Through color fluorescence, the smears were found to match a similar smear sample taken from a condom found in defendant's home. A black animal hair was found on the

condom which matched animal hairs removed from the victim's mouth. According to the medical examiner, the victim died of ligature strangulation most likely caused by the application of a dog leash. The medical examiner also found a small tear on the skin of the victim's anus, along with rectal bruising.

Jerome Calvin testified at trial that on March 12, 1988, in response to a message left on his beeper, he telephoned defendant. Defendant stated that there was something "very important" that he needed to discuss and asked Calvin to come to his home. Calvin went to defendant's home, arriving around noon. A conversation ensued between defendant and Calvin, during which defendant stated that he "had to take someone out last night." Defendant went on to say that he had to kill a man, a woman, and a little girl because they owed him money. Calvin looked at defendant in disbelief, leading defendant to state, "Well, I'm going to tell you what really happened." Defendant then proceeded to give Calvin a second account.

Defendant told Calvin that he drove the man to a remote location where they both got out of the defendant's vehicle. Defendant then shot the man once. The man called out "Jesse" and defendant proceeded to shoot the man several more times in the body and head. Defendant then stated that he drove to the man's home and told the man's wife that her husband had sent for her. Defendant drove the woman to a second location and ordered her from the car. The woman became hysterical and refused to leave the vehicle. Defendant, who indicated that he only had one bullet remaining, shot the woman in her side and pushed her out of his car. Continuing, defendant stated that he went back to the decedents' home to pick up their little

girl because she had seen him with her parents. When defendant arrived, a little girl and boy were present. Defendant took the girl, leaving the boy behind. When Calvin asked defendant why he returned to the decedent's home a third time, defendant responded that the "real reason" was that when he saw the little girl, he felt he "had to have her."

Calvin became alarmed at defendant's account and slowly made his way out the door of defendant's home and stood on the porch. As Calvin was about to leave, defendant stated, "Come here. I want to show you something." Calvin followed defendant into the basement of the home where he observed a little girl sitting on a black leather couch. Defendant stated, "There she go there [sic]." The girl had pink curlers in her hair and was wearing a blue nightgown, and she did not appear to be injured. Subsequently, Calvin left defendant's residence.

The next evening, Calvin was watching the evening news when he saw a story reporting a girl's death, accompanied by a picture. Calvin realized that the girl was the same child he had seen at defendant's home. Calvin met with a police detective the next morning, and informed the officer of what had occurred the day he spoke with defendant at his home.

Defendant fled the State of Michigan on March 14, 1988. On March 16, 1988, an FBI agent in Memphis, Tennessee, received a Teletype message indicating that both federal and state arrest warrants had been issued for Jesse James Mack. The message also gave a possible location for the suspect. Acting on this information, FBI agents went to the stated location, where defendant was apprehended, arrested, searched, and transported to the Memphis Federal Building. Defendant was eventu-

ally extradited to Michigan to stand trial on murder charges.

Defendant was arraigned on March 19, 1988, and appointed counsel on March 31, 1988. On May 12, 1988, appointed counsel filed a motion to suppress photographs of the victims' bodies on the grounds that they were prejudicial and inflammatory, a motion to suppress defendant's confession, a motion to quash the information or reduce the premeditated murder counts to manslaughter, and a motion to reduce the charges to conform to the proofs at the preliminary examination. Defendant's motions were argued on May 23, 1988.

The May 23 motion hearing began with defendant taking issue with his appointed counsel. Defendant claimed that his counsel had not filed the "things" that defendant had requested, particularly a motion for change of venue. Further, defendant contended that his counsel had done nothing "except come here and pretend he my [sic] attorney." The trial court explained to defendant that a motion for change of venue could not be filed until after the start of the jury selection procedures.

Undaunted, defendant continued to argue his dissatisfaction with his appointed counsel and orally moved for a finding of "ineffective assistance of counsel." Finally, the trial court gave defendant the option of retaining his appointed counsel or continuing in propria persona. After defendant was given time to ponder his options, defendant read the *Miranda* warnings to the court and indicated his intention to represent himself. The trial court conceded, but ordered appointed counsel to remain at the defense table throughout the proceedings. Defendant was also given the opportunity to speak with two defense attorneys, but he refused.

On appeal as of right, defendant first contends

that the trial court abused its discretion in denying defendant's request for substituted counsel. Specifically, defendant argues that the trial court's failure to make further inquiries into defendant's claim of dissatisfaction with his appointed counsel forced defendant to represent himself, thereby denying defendant his constitutional right to counsel. We disagree.

An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced. Appointment of a substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. *People v Ginther,* 390 Mich 436, 441; 212 NW2d 922 (1973); *People v Jones,* 168 Mich App 191, 194; 423 NW2d 614 (1988). Good cause exists where a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic. *People v Charles O Williams,* 386 Mich 565; 194 NW2d 337 (1972). The decision regarding substitution of counsel is within the sound discretion of the trial court and will not be upset on appeal absent a showing of an abuse of that discretion. *People v Reinhardt,* 167 Mich App 584, 590; 423 NW2d 275 (1988).

In this case, we conclude that the trial court did not abuse its discretion. Defendant's request for substituted counsel was not supported by a showing of good cause. Appointed counsel filed every appropriate pretrial motion, demonstrating dedication and commitment to defendant's case. Further, a review of the record reveals that appointed counsel was prepared and competent to represent defendant. Finally, we note that not only was defendant given the opportunity to consult with

other defense attorneys, but also appointed counsel was present during the trial proceedings and defendant consulted with him frequently.

Second, in a related issue, defendant asserts that the trial court erred in allowing defendant to represent himself at trial. Specifically, defendant argues that he did not knowingly, intelligently, and voluntarily waive his right to representation.

A defendant has the right to represent himself under both the Michigan and United States Constitutions. Const 1963, art 1, § 13; US Const, Am VI. However,

> [w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." [*Faretta v California,* 422 US 806, 835; 95 S Ct 2525; 45 L Ed 2d 562 (1975). Citations omitted.]

Once a defendant has unequivocally declared his desire to proceed in propria persona, the trial court must determine whether the defendant is asserting his right knowingly, intelligently, and voluntarily. The trial court must make a defendant acting pro se

> aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what "he is doing and his choice is made with eyes open." [*Id.*]

In *People v Lopez,* 71 Cal App 3d 568, 571-572; 138 Cal Rptr 36 (1977), the California Court of Appeals noted:

> Whether the prospective pro per is a naive character who sincerely believes he can represent himself better than can a lawyer, a cagey loser who is going to try to reduce the trial to a shambles in the hope that somehow reversible error will creep in, a free soul with a touch of ham, or simply someone who wants to have some fun with the judicial establishment, the trial judge must recognize that the first ground on appeal is probably going to be that the defendant was allowed to represent himself without having intelligently and voluntarily made that decision. Such are the facts of life. Therefore, pragmatically, and defensively, in addition to the legal necessity of establishing that a defendant voluntarily and intelligently reached this decision, the trial court should also protect itself—and the record.

Here, before allowing defendant to proceed in pro per, the trial court alerted defendant to the serious nature of the charges and that a conviction would result in a possible life sentence. Second, the trial court was willing to declare a mistrial early in the proceedings in order to allow defendant to retain counsel; however, defendant vehemently opposed that option, choosing instead to proceed on his own. Third, defendant had access to his appointed counsel throughout the proceedings and, in fact, deferred to appointed counsel on many occasions. Finally, at one point during the trial, the court instructed defendant on proper courtroom decorum and explained to defendant that he could not proceed in pro per if he engaged in disruptive behavior.

In sum, we conclude that it is "inconceivable that defendant did not know what he was doing."

*People v Riley,* 156 Mich App 396, 401; 401 NW2d 875 (1986). The trial court did not err in permitting defendant to represent himself at trial.

Third, defendant asserts that the trial court abused its discretion in admitting at trial incriminating statements defendant made to the police. Defendant contends that his statements were the result of physical and psychological coercion, specifically alleging that the police interrogated him at gunpoint, denied him food, unduly restrained him, and interrogated him over a lengthy period. We disagree.

Whether a defendant's confession is voluntary is a question of law for the court's determination. *People v Walker (On Rehearing),* 374 Mich 331, 338; 132 NW2d 87 (1965). The burden is on the prosecution to prove voluntariness by a preponderance of the evidence. *People v DeLisle,* 183 Mich App 713, 719; 455 NW2d 401 (1990). In reviewing a trial court's findings, this Court must examine the entire record and make an independent determination with respect to the issue of voluntariness. *People v Kvam,* 160 Mich App 189, 196; 408 NW2d 71 (1987). However, this Court gives ample deference to the trial court, recognizing its superior position in viewing the evidence. Therefore, the trial court's findings will not be reversed unless they are clearly erroneous. A finding is clearly erroneous if this Court, considering all the evidence, is left with a definite and firm conviction that a mistake has been made. *DeLisle, supra; Kvam, supra.*

In *People v Cipriano,* 431 Mich 315, 334; 429 NW2d 781 (1988), our Supreme Court articulated the factors that a trial court should consider in determining whether a statement is voluntary. These factors include:

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

An evidentiary hearing, pursuant to *People v Walker, supra,* was held in this case on May 26, 1988. The record from that proceeding reveals that the trial court carefully considered the *Cipriano* factors in light of the testimony and documentary evidence adduced at the *Walker* hearing. The trial court noted that defendant was age thirty-five and refused the offer of food and drink. Defendant was not under the influence of any drugs or intoxicating substances, and any deprivation of defendant's sleep was attributable to ensuring his safety. Finally, the court found that defendant's allegation of being forced to confess at gunpoint was not true. The trial court concluded that defendant's confession "was voluntary in every instance."

Giving due deference to the trial court's findings, particularly in this instance where the demeanor of witnesses and credibility are important to the court's determination, we are not definitely and firmly convinced that a mistake has been made. Thus, the trial court's finding of voluntariness will not be disturbed.

Fourth, the defendant asserts that he is entitled to a new trial because of prosecutorial misconduct.

Specifically, defendant argues that the prosecutor's closing remarks improperly focused the jury's attention on the victims, rather than the evidence, and that the prosecutor compared defendant with the Devil. We disagree.

We note initially that at the close of proofs and before closing arguments, defendant formally acquiesced to the representation of his appointed counsel. Defense counsel did not object to the alleged improper statements. Thus, appellate review of this issue is foreclosed unless the prejudicial effect was so great that it could not have been cured by a cautionary instruction and failure to consider the issue would result in a miscarriage of justice. *People v Sharbnow,* 174 Mich App 94, 100; 435 NW2d 772 (1989); *People v Wise,* 134 Mich App 82, 105; 351 NW2d 255 (1984).

Questions of prosecutorial misconduct are decided case by case. *People v Foster,* 175 Mich App 311, 317; 437 NW2d 395 (1989). On review, this Court examines the pertinent portion of the record and evaluates the prosecutor's remarks in context in order to determine whether the defendant was denied a fair and impartial trial. *Id.*

In this case, after carefully reviewing the record, we conclude that the prosecutor's remarks did not "rise to the level of impropriety which necessitates reversal." See *People v Marji,* 180 Mich App 525, 539; 447 NW2d 835 (1989). Furthermore, in its charge to the jury, the trial court instructed that "any statements or arguments of the attorneys are not evidence." In sum, we conclude that not only could any alleged prejudice resulting from the prosecutor's closing remarks have been cured by a defense objection, they in fact were cured by the instruction from the trial court. We find no miscarriage of justice here.

Fifth, defendant asserts that he was denied his

Sixth Amendment right to legal assistance when he was not allowed access to a law library. Apparently defendant believes that he has a constitutional right to require the state to provide him with free and unlimited access to a law library. However, we will not read into the constitution a provision guaranteeing a defendant the right of law library access.

It is clearly established beyond a reasonable doubt that prisoners and incarcerated defendants have a constitutional right of access to the courts. Further, the United States Supreme Court has established that, in the absence of other forms of adequate legal assistance, this right of access to the courts requires providing prisoners with adequate assistance from persons trained in the law *or* adequate law libraries to assist prisoners in the filing of legal papers. See *Bounds v Smith,* 430 US 817; 97 S Ct 1491; 52 L Ed 2d 72 (1977). "Prisoners are to be supplied some means of obtaining legal assistance, be it in the form of adequate prison libraries, 'jailhouse lawyers,' or outside legal assistance." *Walker v Mintzes,* 771 F2d 920, 931 (CA 6, 1985). However, the constitutionally guaranteed right is the "right of access to the courts, not necessarily to a prison law library." *Id.,* p 932. Restricted access to a law library is not, per se, a denial of access to the courts. *Id.; United States v Evans,* 542 F2d 805 (CA 10, 1976). The law library is but one factor in the totality of all factors bearing on the inmate's access to the courts which should be considered. *Mintzes, supra.*

In *United States ex rel George v Lane,* 718 F2d 226 (CA 7, 1983), the defendant, who was charged with forgery and appointed a public defender to represent him, entered into a plea bargain with court approval. Later, at his request, the defendant was allowed to withdraw his plea and substi-

tute private counsel. One month later, the defendant changed his mind and, rather than proceeding with his own private counsel, requested that he be allowed to proceed pro se. The trial court granted the defendant's request but, over the defendant's objections, appointed an attorney as "standby counsel." *Id.,* p 227.

Following a mistrial midway through the trial, the case was set for retrial. Before the defendant's second trial, his appointed counsel became ill, was rushed to the hospital, and later notified the court that upon doctor's orders he was discontinuing his trial practice. The trial court then offered to appoint another lawyer for the defendant and to give appointed counsel time to prepare for the trial. In response, the defendant informed the court that he was not satisfied with a local attorney and that he would proceed pro se. Soon thereafter, the defendant requested that the trial court provide him with the use of a law library. The state strenuously objected to the defendant's request to use a law library on the basis of "the serious logistic, personnel and security problems it would create in the administration of a detention facility." *Id.,* pp 227-228. The trial court denied the defendant's request, but appointed an assistant public defender to be available at all proceedings to assist the defendant. The defendant was also advised that he could, at any time during trial, request that the Office of the Public Defender give him advice or take over his defense. Further, the trial court agreed to provide the defendant with legal manuals, treatises, and materials in response to his requests. *Id.,* p 229.

The defendant's forgery case proceeded to trial and was concluded with the jury finding the defendant guilty. The defendant appealed to the Illinois Appellate Court, asserting that he was denied

access to a law library. The appellate court rejected the defendant's contention and affirmed his conviction. *Id.,* pp 229-230. The defendant then filed a habeas corpus petition before the federal district court, once again raising the "library access" question. Without benefit of an evidentiary hearing, the federal district court granted the defendant a writ of habeas corpus and ordered that he be released on the grounds that, as a matter of law, "[w]hen a defendant desires to defend himself without legal counsel, the court cannot require [him] to accept a standby public defender as a substitute for access to legal materials." *Id.,* p 230. The Illinois Attorney General appealed the district court decision to the United States Court of Appeals Seventh Circuit.

On appeal, the federal appeals court noted that "the offer of court-appointed counsel to represent a defendant satisfies the constitutional obligation of a state to provide a defendant with legal assistance under the Sixth and Fourteenth Amendments." *Id.,* p 231. Further, "[a] criminal defendant certainly has a right to refuse counsel and conduct his own defense *in propria persona.*" *Id.,* p 232. Recognizing that "placing the burden of transporting and supervising each and every prisoner (pre-trial detainee) requesting law library access upon detention facility officials would be intolerable" and that "requiring prison officials to accompany inmates to legal research facilities outside of the jail would give rise to a multitude of security problems and to manpower deficiencies," *id.,* the Seventh Circuit went on to state:

After repeatedly offering the petitioner court-appointed counsel, the trial court agreed to provide the petitioner with a number of legal manuals and treatises he requested and directed that

the Public Defender's Office comply with reasonable requests for assistance from the petitioner.

. . .

The trial court on numerous occasions properly offered the petitioner court-appointed counsel and when this offer was repeatedly refused, the court went so far as to designate "stand-by" counsel to assist the petitioner with any questions or a full defense if he so desired. This more than adequately fulfilled the guidelines set forth in *Bounds.* The State offered the defendant George competent, trained legal counsel and we hold it is not the prerogative of a defendant in custody to decide whether he will accept either the State's offer of legal counsel or instead insist that the State provide him with access to "the same facilities that a bar association lawyer would get." [718 F2d 233].

Here, when defendant was arrested on the charges in this case, he was on prison escape status arising from a prior conviction. Defendant pled guilty of prison escape at the sentencing proceeding in this case. Thus, when defendant asked the trial court for "access to a law library," security concerns weighed heavily in the trial court's decision to deny that request. However, defendant was provided with appointed counsel, who filed all appropriate pretrial motions. Later, when defendant indicated he wished to proceed in pro per his appointed counsel was ordered to stand by and assist defendant whenever requested. Further, during the voir dire, the trial court explained to defendant the difference between a challenge for cause and a peremptory challenge. We note that the record reveals that defendant grasped these concepts quite effectively, even having a juror dismissed during the trial. Additionally, defendant was instructed with regard to the importance of submitting a witness list, the procedure for marking exhibits, proper courtroom decorum,

and how to question witnesses. The trial court even assisted defendant in questioning several witnesses and gave defendant great latitude in introducing hearsay testimony, over the prosecution's objections. Finally, defendant had access to his preliminary examination transcript, discovery materials, reports from expert witnesses, and to his appointed counsel.

On this record, we cannot say that defendant was deprived of all avenues of meaningful access to the court. We agree with the Seventh Circuit and hold that "[a] state is not required under the law to offer a defendant law library access once it has fulfilled its constitutional obligation to provide him with competent legal assistance. . . . [The trial court] 'satisfied its obligation under the sixth [and fourteenth] amendment[s] when it offered defendant the assistance of counsel which he declined.'" *Id.,* p 233, quoting *United States v Chatman,* 584 F2d 1358, 1360 (CA 4, 1978).

Lastly, defendant contends that the jury verdict was inconsistent and indicated that the jurors were confused and did not understand the court's instructions. Defendant was convicted of two counts of second-degree murder for the murder of William Rice, first-degree murder and felony murder for the murder of Jacqueline Rice, and first-degree murder and felony murder for the murder of Tameka Rice. We find no error.

Defendant's convictions of first-degree premeditated murder and felony murder for the deaths of Jacqueline Rice and Tameka Rice are not inconsistent. That a defendant may have committed a "wilful, deliberate, and premeditated killing," does not negate the possibility that he also may have committed the killing in the perpetration of criminal sexual conduct or kidnapping. See MCL 750.316; MSA 28.548. Further, because the jury

verdict involved convictions of lesser included offenses, it is apparent that the jury understood the court's instructions and was able to apply those instructions to the evidence without confusion. Finally, before sentencing, the trial court properly vacated one of the second-degree murder convictions and two of the first-degree murder convictions.

In sum, we hold that, absent a legal or logical inconsistency, being convicted of two separate charges of murder for the killing of one person does not constitute error requiring reversal as long as sentencing is properly imposed for only one of the convictions.

Affirmed.