# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DANIEL JAMES DURBIN,

        Defendant-Appellant.

UNPUBLISHED
November 14, 2019

No. 345148
Oceana Circuit Court
LC No. 17-012557-FH

Before: MURRAY, C.J., and MARKEY and BECKERING, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of two counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(a) (sexual penetration of 13 to 15 year old child) and (b) (force or coercion used to accomplish penetration), one count of fourth-degree criminal sexual conduct (CSC-IV), MCL 750.520e(1)(a) (sexual contact with 13 to 15 year old child) and (b) (force or coercion used to accomplish sexual contact), one count of gross indecency, MCL 750.338b, and two counts of accosting a child for immoral purposes, MCL 750.145a. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to 15 to 30 years' imprisonment for the CSC-III convictions, 34 months to 4 years' imprisonment for the CSC-IV conviction, 34 months to 10 years' imprisonment for the gross indecency conviction, and 43 months to 8 years' imprisonment for the accosting convictions. We affirm.

In the winter of 2016, HB resided with her mother and defendant in a trailer for about two to three weeks. HB was 12 years old at the time. She testified that during that timeframe defendant touched her vagina with his hands between 30 and 40 times, including acts of digital penetration.[1] HB asserted that defendant had also touched her breasts with his hands. She stated

---

[1] HB repeatedly testified that defendant had inappropriately touched her 30 to 40 times, but at one point in her testimony she stated that it was more than 40 times. HB, however, also indicated that it was probably less than 30 to 40 times, and on cross-examination she testified that only half of those occasions, 15 to 20 times, involved improper touching. Further, there was some confusion regarding the timeframe of the sexual assaults, as HB testified that the 30 to 40

that defendant had not touched her with any of his body parts other than his hands. HB indicated that her mother was present in the room and observed the sexual assaults on about half the occasions, 15 to 20 times. HB's friend, MH, frequently visited HB at the trailer. HB testified that she observed defendant touch MH's vagina more than 20 times, including digital penetration, and HB also witnessed defendant touch MH's breasts.

MH testified that when she was 13 years old and visited HB at the trailer, defendant regularly touched her breasts, vagina, and butt, including digital penetration of her vagina. MH also claimed that defendant created a hole in the bathroom wall so that he could look at the victims when they showered. MH stated that the victims would take turns covering the hole while the other person showered. She further testified that defendant repeatedly attempted to break into the bathroom to view the victims while they showered. MH asserted that on one occasion she and HB walked into a bedroom and witnessed defendant and HB's mother having sex and that when the girls tried to leave, defendant forced the door closed and made them watch the sex act.

SM testified that when she was 12 years old, she spent a Saturday night at the trailer while HB was living there. According to SM, on that occasion defendant touched and squeezed her butt over and under her clothes. SM additionally testified that she saw defendant touch HB's breasts and butt. Finally, SM claimed that when HB's mother asked the girls to shower because of church services scheduled for the next day, the girls had to form a "protective circle" in the bathroom because defendant attempted to peer at them through the hole in the wall that he had created.

Defendant first argues on appeal that the trial court abused its discretion by refusing to appoint substitute counsel for him when there was good cause to do so. We disagree. On the first day of the trial, while the court was going over preliminary matters before the prospective jurors were led into the courtroom, defendant stated that he wished to fire his attorney "on the grounds of I feel that I'm not being properly represented." Defendant further claimed that he and counsel had not gone over or discussed any type of defense and that counsel had simply attempted to convince defendant to accept a plea offer. Defense counsel then informed the court that he had met with defendant at the jail a "number of times," which was "well documented," and that he had played tapes of victim interviews for defendant, along with giving him transcriptions of the interviews. Counsel also told the trial court as follows:

> We have discussed this case in detail. I've discussed defenses with him and quite frankly, I'm going to say on the record today, he has none. I've told him that. I don't know what else he expects me to do. I think he's got a misunderstanding and is misguided in making his decision. It's against my advice [to decline the plea offer[2]]. I plan to zealously represent him at this trial, as I do

occasions of abuse encompassed not only the two to three weeks that she lived in the trailer, but also times when she simply went to visit her mother at the trailer.

[2] Before defendant asked the trial court to fire his attorney, the parties and the court discussed on the record a plea offer made by the prosecutor. Defendant rejected the offer against the advice of

with all of my clients, but I've tried to tell [defendant] that the evidence against
him is strong and that his defense is weak.

The trial court denied defendant's request to "fire" his attorney. The court explained that the request came much too late and that if matters with counsel were so bad, defendant should have said something to the court a week earlier when defendant was in the court's presence at a final pretrial conference. The trial court also observed that defendant's request had no merit and that sometimes defendants simply do not like "what their attorneys have to say."

This Court reviews for an abuse of discretion a trial court's decision to deny substitution of counsel, and a court abuses its discretion when it renders a decision that falls outside the range of reasonable and principled outcomes. *People v McFall*, 309 Mich App 377, 382; 873 NW2d 112 (2015).[3] The *McFall* panel, discussing the principles applicable to a request for substitute counsel, observed:

> An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced. Substitution of counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. Good cause may exist when a legitimate difference of opinion develops between a defendant and his appointed counsel as to a fundamental trial tactic, when there is a destruction of communication and a breakdown in the attorney-client relationship, or when counsel shows a lack of diligence or interest. A mere allegation that a defendant lacks confidence in his or her attorney, unsupported by a substantial reason, does not amount to adequate cause. Likewise, a defendant's general unhappiness with counsel's representation is insufficient. [*Id.* at 382-383 (citations and quotation marks omitted).]

The caselaw is clear that not only must a defendant establish "good cause" to be entitled to substitution of counsel, he or she must also show that substitution will not unreasonably disrupt the judicial process. *People v Strickland*, 293 Mich App 393, 397; 810 NW2d 660 (2011); *People v Traylor*, 245 Mich 460, 462; 628 NW2d 120 (2001); *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991); *People v Morgan*, 144 Mich App 399, 401; 375 NW2d 757 (1985).

---

his attorney. Defense counsel stated, "I want to make sure that [defendant] knows exactly what he's getting himself into, and I'd ask the [c]ourt to inquire whether at this point in time he rejects the plea and wishes to proceed with jury trial." On the court's inquiry, defendant affirmed that this was his position.

[3] We note that defendant did not actually ask the trial court for substitute counsel; he merely requested that the court fire his attorney. But defendant did not indicate any desire to represent himself, so we surmise that defendant's intention was to obtain new counsel if present counsel was released.

-3-

In this case, we hold that substitution of counsel would have *unreasonably* disrupted the judicial process. The jury venire was in the courthouse, and the prosecutor's five witnesses were on hand and prepared to and ultimately did testify that day. There is nothing in the record suggesting that defendant's unhappiness with counsel was a development that arose for the first time on the day that trial was to commence. And the trial court specifically noted that defendant had an opportunity a week earlier to inform the court about any issues or problems with appointed counsel and that he failed to voice any complaints.

At the final conference held a week before the trial, where defendant was present, defense counsel stated that he had met with defendant for "almost four hours . . . at the jail" going over the case and reviewing a plea offer. According to defense counsel, defendant had decided to accept the plea, but had now changed his mind and wished to go to trial. Defendant informed the trial court that counsel's statement was accurate. Toward the end of the conference, the trial court asked defendant if he had any questions regarding comments made by the court allowing an amendment of the information. Defendant responded that there were no questions. The court also asked defendant if he had an opportunity to discuss matters with counsel, and defendant replied in the affirmative. Defendant had every opportunity at the final conference to tell the court that he wished to have counsel discharged but said nothing. There was simply no excuse for defendant to wait until the first day of trial to raise the issue. See *Strickland*, 293 Mich App at 399 ("Strickland waited until the day of trial to request new counsel. The jury and witnesses were present, and the prosecutor and defense counsel were ready to proceed. A substitution of counsel at that point would have unreasonably delayed the judicial process.").

In light of our holding, there is no need to reach the issue of "good cause." Nonetheless, we conclude that good cause existed. It is very clear from reviewing the final conference, trial, and post-trial transcripts that defense counsel was adamant that he wanted defendant to accept the prosecution's plea offer and that going to trial would be a dangerous avenue for defendant. But there is nothing in the record suggesting that defense counsel was doing so for any reason other than counsel's belief that a plea agreement would be in defendant's best interests. Moreover, when defendant decided to go to trial, counsel indicated that he was prepared to zealously provide a defense. The record does not support a conclusion that there was a difference of opinion as to a fundamental trial tactic, a destruction of communication, a lack of diligence or interest by counsel, or a breakdown in the attorney-client relationship. Defendant was just generally unhappy with how counsel was defending him. We understand that the trial court's ruling on "good cause" was cursory, but there was no abuse of discretion and the court's main focus was on defendant's request delaying the judicial process.

Defendant next argues that he was denied the right to the effective assistance of counsel. Defendant filed a motion for new trial on the basis of ineffective assistance, and the trial court did hold a *Ginther*[4] hearing before denying the motion. Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error while we review de novo issues of constitutional law. *People v LeBlanc*, 465 Mich

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

575, 579; 640 NW2d 246 (2002). In *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), the Michigan Supreme Court recited the principles applicable to claims of ineffective assistance of counsel:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy [a] two-part test . . . . First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. Second, the defendant must show that the deficient performance prejudiced the defense. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [Citations and quotation marks omitted.]

An attorney's performance is deficient if the representation falls below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

We first address defendant's contention in his Standard 4 brief that counsel was ineffective by failing to contact and interview a number of witnesses, including HB's mother and defendant's grandmother, who had also resided in the trailer, and by failing to produce these witnesses at trial. Although defendant claims that these witnesses could have testified favorably for the defense, he failed to seek testimony from these individuals at the *Ginther* hearing. Neither did he obtain any affidavits from these claimed witnesses. Because we can only speculate regarding the nature or substance of their testimony, assuming that they would, it is impossible to assess this claim of ineffective assistance of counsel as to whether counsel's performance was deficient and whether prejudice was incurred. Defendant has effectively failed to meet his burden of establishing the factual predicate for his claim. Reversal is unwarranted.

Defendant also argues that defense counsel was ineffective because he failed to impeach HB with various statements that she had made to investigators. "Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

First, in a July 5, 2017, interview, HB was asked how often the improper touching occurred, and HB responded, "Not too often, but like sometimes." And in a July 10, 2017 interview, HB stated that the sexual assaults took place "once in a while." Defendant argues that counsel should have impeached HB with these statements. At the *Ginther* hearing, defense counsel testified that he did not view these vague statements as all that inconsistent with HB's trial testimony, and he did not wish to be viewed by the jury as attacking HB over less than compelling inconsistencies. Counsel also indicated that HB's statements to investigators confirmed her claim that defendant had indeed touched her in an inappropriate manner, which

-5-

could have bolstered her trial testimony. Further, defense counsel was worried that he would be opening the door to other statements made by HB to investigators in which she asserted that defendant had penetrated her vagina with his penis on several occasions. We will discuss the alleged penile-vaginal penetrations in more detail below.

At trial, on cross-examination of HB, defense counsel was able to elicit testimony that of the 30 to 40 times that defendant touched her, only half of those touches were inappropriate. On redirect examination, HB acknowledged that she was only estimating the number of times that defendant touched her in a sexual manner. HB's trial testimony was not very consistent with respect to the number of times that defendant touched her inappropriately. HB clearly struggled, understandably so, in putting a number on the times that defendant sexually assaulted her. The pretrial statements made by HB to investigators, as quoted above, would have added little to nothing to the defense. Importantly, the jury witnessed HB's confusion regarding the number of improper acts, yet plainly it still found her credible. Indeed, we question whether the statements to investigators were truly inconsistent with her trial testimony. The statements were vague, and there is nothing in the record showing anyone sought to clarify what HB exactly meant when she said that the sexual assaults occurred "once in a while," "not too often," and "sometimes." Defense counsel testified at the *Ginther* hearing that he had read and was familiar with all of the HB interviews and that, as mentioned earlier, he had to walk a perilous line between being seen as attacking the youthful victim and defending his client, which explained in part why he did not elicit testimony on the so-called inconsistent statements. We cannot conclude that counsel's performance was deficient or that defendant was prejudiced by any assumed deficiency.

Next, defendant points to a July 10, 2017, interview in which HB stated that her mother did not know what was going on. Defendant argues that counsel should have impeached HB with this statement, which was inconsistent with her claim at trial that her mother was aware of and had witnessed the sexual abuse. At the *Ginther* hearing, defense counsel testified that he thought that there would be a hearsay problem with respect to what HB's mother said, noting that HB's mother did not testify "because she herself was charged with inappropriate behavior." We conclude that the hearsay argument had no merit, considering that hearsay issues would not have been implicated in regard to testimony by HB concerning whether her mother was present and witnessed the abuse. The few pages of the transcript of the July 10, 2017 interview that are in the record revealed that the statement regarding HB's mother was made in the context of those occasions on which defendant allegedly touched HB and MH while they were together. At trial, HB testified that her mother witnessed half of the assaults committed by defendant against HB. HB did not specifically testify that her mother observed sexual assaults wherein HB and MH were both being abused at the same time. Thus, we have no definitive evidence of an inconsistent statement; therefore, we cannot conclude that counsel's performance was deficient or that defendant was prejudiced by any assumed deficiency. But even if there were an inconsistency, we simply cannot find that this discrepancy, if presented to the jury, would have affected the outcome of the proceeding.

In an August 24, 2017, interview, which was the last of several interviews with HB, she indicated that there were five to seven times that defendant had placed his penis inside her vagina. Defendant argues that counsel should have impeached HB with this statement, which was inconsistent with her claim at trial that defendant had only touched her with his hands. At the *Ginther* hearing, defense counsel testified that he did not wish to elicit testimony about the

claims HB made in her final interview of penile-vaginal penetration. Although the statements were inconsistent with her trial testimony, counsel worried in part that the jury would be inflamed if it heard that defendant had actually had sexual intercourse with HB.

At the *Ginther* hearing, defense counsel was questioned by appellate counsel, the prosecutor, and the trial court. And the subject of HB's statements made during her final interview was extensively discussed, with the prosecutor injecting some of his own thoughts on the history of the case while formulating questions for defense counsel. The record of the *Ginther* hearing indicated that the prosecutor made his charging decisions before HB's final interview and that he chose not to pursue a charge of first-degree criminal sexual conduct (CSC-I), MCL 750.520b, even after he learned about HB's claims of penile-vaginal penetration. Defense counsel agreed with the prosecutor at the *Ginther* hearing that the prosecutor's charging decisions were conservative and generous to defendant. Defense counsel revealed that in chambers in the district court there was some discussion about the possibility that defendant could be charged with CSC-I.[5] Defense counsel testified that fear of the prosecution amending the charges to add a CSC-I charge played a role in his decision not to dig into HB's statements regarding penile-vaginal penetration.[6]

"An information may be amended at any time before, during, or after trial to cure any defect, imperfection, or omission in form or substance, including a variance between the information and the proofs, as long as the accused is not prejudiced by the amendment and the amendment does not charge a new crime." *People v Higuera*, 244 Mich App 429, 444; 625 NW2d 444 (2001), citing MCL 767.76. We seriously question whether the prosecutor could have amended the information at trial to add a CSC-I charge had defense counsel chosen to try and impeach HB on cross-examination with her statements claiming that sexual intercourse had occurred. Nevertheless, we cannot conclude that defense counsel's performance fell below an objective standard of reasonableness or that defendant was prejudiced by any presumed deficient performance. Although the investigatory statements were inconsistent with HB's trial testimony, and while we fully appreciate that the case presented a credibility contest, we simply do not believe that introducing statements that on five to seven occasions defendant penetrated HB's

---

[5] Defendant waived the preliminary examination, at which point the CSC-III and CSC-IV charges were based solely on sexual penetration or contact and the ages of HB and MH. Later, the prosecutor was allowed to amend the CSC-III and CSC-IV charges to add claims of sexual penetration and contact involving force or coercion.

[6] We must admit to some confusion regarding the whole matter regarding CSC-I versus CSC-III as to HB. Sexual intercourse *and* digital penetration constitute "sexual penetration," MCL 750.520a(r), whether it be for CSC-I or CSC-III. CSC-I is implicated when, in part, the sexual penetration involves a victim under 13 years of age, MCL 750.520b(1)(a), or when it was accomplished by use of force or coercion that produced personal injury, MCL 750.520b(1)(f). Perhaps the prosecutor, as a matter of discretion, makes a distinction between digital penetration and penile-vaginal penetration for purposes of charging decisions. We note that HB testified that she was 11 and 12 years old when defendant sexually assaulted her.

vagina with his penis would have been viewed by the jury in defendant's favor. A reasonable attorney could logically determine that there would be too much danger going down that road.

Finally, in a July 21, 2017, interview, HB asserted that on one occasion defendant called HB and MH into a bedroom where defendant was having sex with HB's mother. HB stated that, after entering, she and MH then just walked out of the bedroom without any attempt by defendant to stop them from leaving. Defendant argues that counsel should have impeached MH with HB's statements because they were inconsistent with MH's testimony that defendant forced HB and MH to stay in the bedroom and watch the sex act. Defendant also contends that counsel should have questioned HB about the matter on cross-examination. At the *Ginther* hearing, defense counsel testified that the situation regarding the incident in the bedroom was confusing and that using HB's statements would have had minimal benefit and was not worth the risk of opening the door to prior statements. Counsel was also concerned with how MH and HB would have responded.

Defendant fails to provide us with any analysis of the rules of evidence that would have allowed defense counsel to inquire of MH about a pretrial statement made by HB; consequently, we reject that aspect of his argument. See *People v Hicks*, 259 Mich App 518, 532; 675 NW2d 599 (2003) ("A party may not announce a position on appeal and leave it to this Court to unravel or elaborate his claims."). With respect to questioning HB, defense counsel would have had to first ask HB about the incident before calling attention to her statements made during the interview, assuming that HB's trial testimony would have differed from her earlier statements. The incident was relevant to the gross indecency charge. And even though HB stated in her interview that defendant did not force the girls to remain in the bedroom, she did claim that defendant called the girls into the room while he was having sex with HB's mother so that they would witness the sex. Therefore, we fail to see how bringing HB's pretrial statements to the jury's attention would have been beneficial or favorable to defendant. Prejudice has not been shown, assuming deficient performance.

We affirm.


/s/ Christopher M. Murray
/s/ Jane E. Markey
/s/ Jane M. Beckering