# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

LUJUAN CARL MCCANTS,

       Defendant-Appellant.

UNPUBLISHED
July 17, 2018

No. 331248
Macomb Circuit Court
LC No. 2015-000941-FC

Before: BECKERING, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

Defendant, LuJuan Carl McCants, appeals by right his jury convictions of armed robbery, MCL 750.529, first-degree home invasion, MCL 750.110a(2), unlawful imprisonment, MCL 750.349b, unlawful driving away of a motor vehicle (UDAA), MCL 750.413, possession of a firearm by a felon, MCL 750.224f, and possession of a firearm when committing or attempting to commit a felony (felony firearm), MCL 750.227b. The trial court sentenced defendant as a second habitual offender, MCL 769.10, to serve concurrent prison terms of 280 to 480 months each for armed robbery and home invasion, 180 to 270 months for unlawful imprisonment, 36 to 90 months each for UDAA and felon in possession of a firearm. The trial court also sentenced defendant to serve two years' imprisonment for felony firearm prior to the sentences for his remaining convictions. Finally, the trial court held defendant jointly and severally liable with Dominic Waters and Taija Bush[1] for $8,655 in restitution. We conclude that there are no errors warranting a new trial and affirm defendant's convictions and restitution liability.

## I. STATEMENT OF PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from a December 16, 2014 incident at the Mount Clemens home of Brenda Wilson. Wilson testified at defendant's trial that at around 5:00 or 5:30 p.m. she looked out the kitchen window of her mother's house, which is located diagonally from her own, and saw an unfamiliar car parked across the street with three black men and a black female inside. The female was driving and the male in the front passenger seat was wearing a brown

---

[1] Initially codefendants, Waters and Bush were eventually tried together, but separately from defendant.

Carhartt-style work jacket. Both of them kept looking up at her mother's kitchen window. Wilson identified defendant as the man in the work jacket

Later that evening, Wilson drove her son, Randy, to his girlfriend's house, returning home at around 10:30 p.m. As she approached the side entrance of her house, three people ran up to her from behind the house, and one of them put a gun to her neck. Wilson testified that the gunman was wearing a mask, but she could see his eyes, and she recognized defendant as the man she had seen earlier that day in the car parked across the street from her mother's. Wilson said that defendant told her to be quiet and open the door, and he kept the gun to her neck until everyone got inside. He then had her go into the living room and sit on a loveseat. On defendant's instruction, one of the other robbers attempted to zip tie Wilson's hands behind her back. She said that the men turned on every light in the house and proceeded to rummage around in the bedrooms at the back of the house, as defendant kept yelling at them and asking her where the money and weed was located. Wilson said defendant was waving the gun around and saying he would kill her. One of the other men dumped Wilson's purse out on the table and removed two envelopes containing a total of $410. Wilson testified that in addition to the money, the robbers stole items that included a 42-inch television, all of her grandchildren's Christmas toys, a video game player, two shotguns, a hunting bow, a hunting seat, coats, a black and red hunting satchel, and a DVD-player. Once they finished, the robbers let Wilson move to a dining room chair, where one of them duct taped her legs together before they left with her keys, cell phone, and car. Using a knife that was on the table, Wilson freed herself and waited for the robbers to drive away. She then locked the side door and went out the back door to summon help from her neighbor.

Deputies from the Macomb County Sheriff's Department arrested defendant the following day, December 17, 2014, in the parking lot of the apartment complex where Bush lived; he was driving a silver Chevrolet Impala. Prior to the preliminary examination, a local newspaper published pictures of defendant, Bush, and Waters, identifying them as arrestees in the home invasion and armed robbery that occurred at Wilson's home.[2] Defendant appeared at the preliminary examination in jail attire and sat with Bush and Waters behind defense counsel. Wilson identified defendant as the man who held the gun to her neck and whom she had seen sitting in the car parked across the street from her mother's house on the day of the robbery.

Subsequently, defendant filed a motion for the appointment of an eyewitness expert "to testify about the foibles and mistakes" of eyewitness identifications. The prosecution opposed the motion, asserting among other things that defendant failed to show that the facts of the case required expert testimony. The prosecution also argued that publication of defendant's photograph in the newspaper was not a state action, and therefore, did not qualify as an unduly suggestive pretrial identification procedure, and that even if it did, Wilson had an independent basis for her identification. The trial court took defendant's motion under advisement.

---

[2] Law enforcement officers involved in the case did not conduct any pretrial identification procedures.

The trial court conducted a *Wade*[3] hearing on July 24, 2015. The court later issued a written opinion and order deeming Wilson's in-court identification of defendant at the preliminary examination "impermissibly suggestive." The Court based its decision on Wilson's having seen defendant's photograph in the local newspaper prior to the preliminary examination, coupled with the fact that defendant was sitting behind the defense table wearing jail garb. The court then conducted an independent-basis analysis and concluded that Wilson's opportunity to personally observe defendant's eyes in her well-lit home during the robbery constituted an independent basis for identifying defendant. In the same opinion and order, the court denied defendant's motion for an eyewitness expert, explaining that defendant had failed to show any special circumstances warranting an expert to assist the jury in examining the circumstances under which Wilson identified him.

Defendant's four-day trial began on October 6, 2015. In addition to Wilson's testimony, the jury heard from Markenya Crigler, who testified that defendant left her home on East Lafayette Street in Detroit at around 7:00 or 8:00 p.m. on December 14, 2016, driving a silver Chevy Impala owned by her daughter. Defendant telephoned her six or seven hours later, telling her that he had some items in the car and needed her help. Crigler testified that she met defendant at the front door of her apartment and retrieved some toys and a bag from the trunk of the car. Crigler said that defendant was wearing his brown, Carhartt-like work jacket. Detective Sergeant Melissa Stevens, supervisor of the major crimes unit of the Macomb County Sheriff's Department, later testified that when the investigation into the home invasion and robbery led her to Crigler's home, Crigler was cooperative and forthcoming, and she consented to a search of her apartment. The search recovered items matching those taken from Wilson's home. Det. Sgt. Stevens also testified that she observed the sleeve of a brown Carhartt-type jacket sticking out of a partially opened closet in Crigler's apartment.

Shea Truxell, an officer with the Clinton Township Police Department, recounted that on the night of December 16, 2014, she and her partner were patrolling an area near Wilson's home when they received a call about a suspicious car just after 11:00 p.m. The car was a silver Impala driven by a black female later identified as Bush. Officer Truxell asked Bush to leave the area because residents were complaining about her parking there. One of the officers took down the Impala's license plate number and, upon learning that there had been a home invasion and robbery in the area, shared the number with the Macomb County Sherriff's Department. Members of the crime unit ran the plate numbers given them by Truxell, received a couple of associated addresses, and set up surveillance at each address, one of which was Crigler's residence. Det. Sgt. Stevens testified that officers located the car at Crigler's residence and watched as defendant got into it and drove away. Detective Christopher Fraser, also of the Macomb County Sherriff's Department, testified that he and several other officers in unmarked cars followed the suspect car until they had enough information to make contact with defendant in the parking lot of Bush's apartment complex, where they arrested him.

---

[3] *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

Macomb County Sheriff's Deputy Daniel Cikota, a computer forensic examiner, testified that he extracted data from several cell phones associated with the charged crimes, including an Alcatel phone confiscated from defendant, a Samsung Galaxy phone confiscated from Bush, and an HTC phone confiscated from Waters. He also obtained phone records from the relevant service providers and compared them with the extracted data. The deputy testified that on December 17, 2014, at around 1:21 a.m., a message was sent from the HTC phone to the Alcatel phone asking, "When can I get my cut." Later that day, messages were sent from the HTC phone to the Alcatel phone stating, "let me get the rifle, plz for 50, $60. They say it was 480 in the purse[,]" and "And they got the car. Shit, they doing good." Deputy Cikota testified to messages sent from the Alcatel phone to the HTC phone stating, "Bum ass lick. What do you expect from it[,]" "That shit was a waste of my time, Bro . . .[,]" and "Fuck the TV. I get down for the cash, Bro, for work. That a waste of my time." In addition, Deputy Cikota testified to text messages sent from the Samsung Galaxy phone to the Alcatel phone on December 16, 2014. Two of the messages were sent around the time of the home invasion and robbery; a message sent at 11:19 p.m., around the time Truxell asked Bush to move her car, stated that the police were there. Deputy Cikota acknowledged under cross-examination that his analysis of the messages did not necessarily reveal who sent and received the messages.

Joseph Duncan, an investigator with the Macomb County Prosecutor's Office, testified to the results of his analysis of the records for the phones confiscated from defendant, Bush, and Waters. He testified that a number of calls from the HTC phone to the Alcatel phone made between 9:10 p.m. and 9:48 p.m. on the night of the incident pinged off a cell tower near where the home invasion occurred, indicating that the Alcatel phone was in that vicinity. Duncan also testified that calls between the Alcatel phone and the Samsung Galaxy phone made during the 11:00 p.m. hour pinged in the same area, likely off the same cell towner. Duncan acknowledged under cross-examination that the records themselves did not show that a robbery took place.

After the close of testimony and over defendant's objections, the prosecution requested a jury instruction on aiding and abetting. Finding that the evidence supported an aiding-and-abetting theory, the trial court instructed the jury accordingly. Subsequent to his conviction and the imposition of sentence, defendant filed a post-trial motion for a *Ginther*[4] hearing, a new trial, and correction of defendant's presentence investigation report (PSIR). The trial court denied the motion. Defendant filed in this Court a motion to remand, which the Court granted in part and remanded in part. The Court remanded the matter to the trial court to allow defendant to move for a new trial on the issue of whether jurors saw him in shackles, but denied the motion as to all other issues.[5]

On remand, the trial court heard testimony from defendant and three of his relatives claiming that counsels' table during defendant's trial was akin to a picnic table and allowed jurors to see defendant's ankle shackles through the opening below the table's top. Defendant

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] *People v LuJuan Carl McCants*, unpublished order of the Court of Appeals, entered February 13, 2017 (Docket No. 331248).

also testified that jurors once saw him in shackles when Deputy Jeffrey Haase hurried him from the bathroom into the courtroom in advance of the approaching jurors, that he reported this to his attorney, and that his attorney told him not to worry about it. The prosecutor at defendant's trial, defendant's trial attorney, and Deputy Haase testified that no one brought any concerns regarding shackling to their attention. The prosecutor and the defense attorney testified that if there had been any question that a juror had seen defendant in shackles, even inadvertently, they would have investigated, made a record of the matter, and, in the case of the defense attorney, moved for a mistrial. Deputy Haase testified that he had no memory of the bathroom-to-courtroom incident defendant described and did not recall any time when the jury saw defendant in shackles. He also stated that court officers did not put incarcerated defendants in shackles during jury selection because potential jurors sitting in the gallery might see the shackles.

During a second hearing, Deputy Ralph Sauger, who served as extra security for a portion of defendant's trial, testified that he put shackles on defendant in the back, brought him into the courtroom, and sat him beside his attorney. He said that he did not remember being present for jury selection, but then answered affirmatively when asked whether defendant was wearing shackles during jury selection. Under cross-examination, Deputy Sauger clarified that when he earlier testified that he brought defendant into the courtroom in chains, he had meant after the jury had been selected, not when the jury gallery was full of potential jurors. Deputy Sauger said that jurors were not allowed to see defendants in chains, and defendants would not be shackled during jury selection if there were any chance that potential jurors could see the chains. He reiterated that he did not remember being present for jury selection,[6] but said that if he had been present, he would have taken his instructions from Deputy Haase. If Deputy Haase said that defendant was to remain unshackled during jury selection, he would have followed those instructions.

The trial court denied defendant's motion for a new trial. The court did not find credible testimony indicating that the defense table at the time of defendant's trial was similar in style to picnic tables. Based in part on 15 years of experience in the same courtroom, the court found credible the testimony indicating that a partition had shielded defendant's legs from the jury during his trial. The court also did not find credible defendant's testimony about the bathroom-to-courtroom incident with Deputy Haase and defendant's subsequent conversation with his trial counsel. Instead, the court credited the testimony of defendant's trial counsel that if such a situation had occurred, he would have made a record and moved for a mistrial. The court likewise found credible the testimony of the prosecutor during defendant's trial that he, too, would have made a record of the incident and, in the absence of such record, it was fair to infer that it did not occur. The court concluded that the evidence did not establish that any juror actually saw defendant in shackles, and that, although defendant said that the shackles affected his self-esteem, he had "failed to offer specific testimony as to how shackles actually hindered his ability to communicate with his attorney." The court concluded that shackling did not deprive defendant of a fair trial, and that defendant was not entitled to a new trial. The court also

---

[6] The record indicates that Deputy Sauger may have been present for jury selection; one of the jurors told the judge that he recognized Deputy Sauger as a classmate from high school.

denied defendant's request to recall jurors for limited testimony on the ground that Deputy Sauger's testimony "failed to indicate that a prospective or seated juror saw defendant's leg shackles."

## II. ANALYSIS

## A. IDENTIFICATION TESTIMONY

Defendant first contends that the trial court erred in denying his motion to suppress Brenda Wilson's identification testimony. We disagree. We review for clear error a trial court's determination in a suppression hearing regarding admission of identification evidence. *People v Barclay*, 208 Mich App 670, 675; 528 NW2d 842 (1995). "A decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*.

Because Wilson's identification occurred after she saw a photograph of defendant in a newspaper article identifying him as an arrestee in her case and then saw him at the preliminary examination wearing jail clothes and sitting at the defense table, the trial court deemed it necessary to determine whether Wilson had an independent basis for her in-court identification of defendant. See *People v Laidlaw*, 169 Mich App 84, 92; 425 NW2d 738 (1988) ("The need to establish an independent basis for an in-court identification arises where the pretrial identification is tainted by improper procedure or is unduly suggestive."). Whether a witness has an independent basis for his or her identification testimony is a factual inquiry, the validity of which "must be viewed in light of the 'totality of the circumstances.'" *People v Gray*, 457 Mich 107, 115; 577 NW2d 92 (1998), quoting *Neil v Biggers*, 409 US 188, 199; 93 S Ct 375, 382, 34 LE 2d 401 (1972). Courts should use the following eight factors in determining if an independent basis exists:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense.

3. Length of time between the offense and the disputed identification. . . .

4. Accuracy or discrepancies in the pre-lineup or showup description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. [T]he nature of the alleged offense and the physical and psychological state of the victim. . . .

* * *

8. Any idiosyncratic or special features of defendant. [*Gray*, 457 Mich at 116 (quotation marks and citations omitted).]

-6-

Although the trial court did not find that factors 1, 4, 5, 6, and 8 weighed in favor of finding an independent basis, it found that factors 2, 3, and 7 did.

Factor 2, the opportunity to observe the offense, "plays a significant role in the independent basis analysis." *Id*. at 117. It "includes such factors as length of time of the observation, lighting, noise or other factors affecting sensory perception and proximity to the alleged criminal act." *Id*. at 116. Wilson testified that her house was well lit, defendant came into the living room to talk to her at least three times after she was tied up, she could see his eyes, which were not covered by his mask, and each time she looked "dead at him." She testified at the preliminary examination that the robbers were in her house for 45 minutes to an hour. Wilson's testimony thus establishes that she had ample opportunity to see defendant's eyes during the robbery. Factor 3, length of time, also weighs in favor of an independent basis, as Wilson's identification at the preliminary examination occurred just over two months after the home invasion. See *People v McElhaney*, 215 Mich App 269, 287-288; 545 NW2d 18 (1996) (holding that a preliminary examination identification was proper where the complainant had ample opportunity to observe her attacker and the preliminary examination took place only two months after the attack). Regarding factor 7, no evidence suggests that Wilson was too scared to accurately perceive or remember what was happening, that she was overly tired or under the influence of nervous exhaustion, alcohol, or drugs. See *Gray*, 457 Mich at 116 (noting that strong emotions can affect perception and memory and that factors such as "fatigue, nervous exhaustion, alcohol, and drugs" are relevant). Nothing in the preliminary examination or the *Wade* hearing transcripts indicates that her age or cognitive abilities negatively affected her powers of perception or her ability to remember what she saw.

Based on the foregoing, we cannot say that the trial court clearly erred when it ruled that Wilson had an independent basis for her identification of defendant at the preliminary examination, and that her identification testimony was admissible. But even if the trial court had clearly erred by denying defendant's motion to suppress, MCR 2.613(A) provides that an error in the admission of evidence will not be grounds for setting aside a verdict "unless refusal to take this action appears to the court inconsistent with substantial justice." See also MCL 769.26. "[W]hen testimony is erroneously admitted, [the Court] must determine the probable effect of that testimony on the 'minds of the average jury.' " *People v Banks*, 438 Mich 408, 430; 475 NW2d 769 (1991), quoting *Schneble v Florida*, 405 US. 427, 432; 92 S Ct 1056, 1060; 31 L Ed 2d 340 (1972).

Setting aside the verdict in the case at bar is unwarranted because the testimony of Crigler, Deputy Cikota, and Duncan firmly supports it. Crigler's testimony indicated that defendant dropped off at her apartment toys and items later identified as taken from Wilson's home. Deputy Cikota testified to incriminating text messages sent and received by the phone confiscated from defendant around the time of the home invasion and armed robbery. Duncan testified to cell phone data that put defendant near the home invasion at the time it was occurring and showed him traveling from Mount Clemens to Detroit immediately after the incident. Assuming that the jury found the testimony of these witnesses credible, the jury could conclude beyond a reasonable doubt that defendant committed the charged crimes, even without Wilson's identification testimony. Given the strength of the evidence against defendant other than Wilson's eyewitness identification, we cannot say that the probable effect of her testimony on

the minds of the average jury was so great that its exclusion would warrant reversal of the jury's verdict.

## B. IDENTIFICATION EXPERT

Defendant next contends that the trial court abused its discretion by denying his motion for an expert in eyewitness identification. Again, we disagree. "The Court reviews for an abuse of discretion a trial court's decision whether to grant an indigent defendant's motion for appointment of an expert witness." *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006). An abuse of discretion occurs when the trial court's decision falls outside the range of acceptable outcomes. *Carnicom*, 272 Mich App at 617.

In *People v Kennedy*, __ Mich __; __ NW2d __ (2018) (Docket No. 154445); slip op at 17, the Michigan Supreme Court held that the due process analysis in *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985) governs an indigent defendant's request for an expert witnesses. In determining whether due process requires the State to provide an expert witness to an indigent defendant, courts must consider the three-factor due process test set forth in *Mathews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976):

> (1) "the private interest that will be affected by the action of the State," (2) "the governmental interest that will be affected if the safeguard is to be provided," and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." [*Kennedy*, __ Mich at __; slip op at 6, quoting *Ake*, 470 US at 77.]

The first two factors will generally weigh in favor of providing an expert witness at State expense. "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling." *Ake*, 470 US at 77. And although a State has an interest in prevailing at trial, this interest "is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases." *Id*. at 79. The third factor looks at the probable value of the expert assistance sought and "the risk of error in the proceeding if such assistance is not offered." *Kennedy*, __ Mich at __; slip op at 8, quoting *Ake*, 470 US at 79. In order to show that due process requires the appointment of an expert,

> "a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." [*Kennedy*, __ Mich at __; slip op at 18, quoting *Moore v Kemp*, 809 F2d 702 (CA 11, 1987.]

In the case at bar, defendant argued that an expert in eyewitness identification was necessary to testify generally to the "vagaries and mistakes of eyewitness identification." However, it was not enough for defendant to "show a mere possibility of assistance from the

requested expert." *Kennedy*, __ Mich at __; slip op at 18; see also *Carnicom*, 272 Mich App at 617 ("it is not enough for a defendant to show a mere possibility of assistance from the requested expert"). Defendant opined that the jury should hear from an expert that after a startling event, where the victim saw the perpetrator briefly and then saw a photograph of a person the police told her was the perpetrator, the victim bases her identification on recognition of the photograph, not on recognition of the actual perpetrator. However, record evidence indicates that Wilson's encounter with defendant was not brief, and no record evidence suggests that police told Wilson that defendant, one of two black men pictured in the newspaper, was the perpetrator who held a gun to her neck. Because defendant failed to show "more than the mere possibility of assistance from the requested expert," we conclude that the trial court did not abuse its discretion by denying defendant's request for an eyewitness expert.[7]

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also contends that he is entitled to remand for a *Ginther* hearing to make a record of the true nature of the attorney-client relationship. We disagree. Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact, and it reviews de novo questions of constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

To establish ineffective assistance of counsel, defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). Defense counsel has wide discretion as to matters of trial strategy. *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012). This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

Defendant first argues that he is entitled to a *Ginther* hearing to establish that his attorney did not want to represent him. He is not. The ineffective assistance analysis centers on performance and the prejudicial effect of deficient performance to the defendant. *Smith v Spisak*, 558 US 139, 150; 130 S Ct 676; 175 L Ed 2d 595 (2010); see also *People v Pubrat*, 451 Mich

---

[7] On appeal, defendant relies on the dissent in *People v Blevins*, 314 Mich App 339; 886 NW2d 456 (2016) (SHAPIRO, J., dissenting), to contend that the trial court clearly erred in denying his request for an expert witness. The case at bar is distinguishable from *Blevins*. Whereas the jury convicted the defendant in *Blevins* on eyewitness testimony alone, here, the jury had forensic evidence and testimonial evidence other than eyewitness testimony to consider, all of which supported Wilson's identification testimony. Although the points made by the dissent in *Blevins* are well worth considering, they are inapplicable to the case at bar.

589, 596; 548 NW2d 595 (1996) (noting that the right to effective assistance of counsel is substantive and focuses on the actual assistance received). Accordingly, defense counsel's disposition, alone, cannot provide a basis for a claim of ineffective assistance.

Defendant next argues that his attorney rendered ineffective assistance when he refused to go to the evidence room to examine evidence that would be presented at trial, did not ask for a cell phone expert to refute the prosecution's case, and did not investigate the men found driving Wilson's stolen car. Defendant asserts that, but for counsel's allegedly deficient performance, there is a reasonable probability that the result of the trial would have been different. *Strickland*, 466 US at 694. However, defendant's unsupported assumption that further investigation would turn up evidence beneficial to his case does not constitute an actual showing of prejudice, without which defendant cannot prevail on his claim of ineffective assistance. See *People v Pickens*, 446 Mich 298, 314; 521 NW2d 797 (1994).

Defendant also argues that his attorney rendered constitutionally ineffective assistance because he did not file an interlocutory appeal of the trial court's denial of his motion to suppress. As we indicated above, the trial court did not abuse its discretion in denying defendant's motion to suppress Wilson's identification testimony. By filing an interlocutory appeal of the trial court's ruling, counsel would have been advocating a meritless position. "Counsel is not ineffective for failing to advocate a meritless position." *People v Mack*, 265 Mich App 122, 130; 695 NW2d 342 (2005) (quotation marks and citation omitted).

Defendant further argues that his attorney rendered constitutionally ineffective assistance with inadequate cross-examinations of Brenda Wilson and her son, Randy Wilson. Defendant's contention with regard to Randy Wilson is without merit. Randy testified as a defense witness and was not subject to cross-examination by defense counsel. Defendant has pointed to no deficiencies in counsel's examination of Randy. With regard to Brenda Wilson, defendant does not indicate in his main brief how counsel's cross-examination was deficient. He contends in his standard 4 brief,[8] however, that he and his attorney agreed on a trial strategy that included undermining Brenda's credibility, but counsel did not execute this strategy; instead, counsel missed several opportunities to point out the inconsistencies in Brenda's testimony.

Our careful review of the record convinces us that defense counsel did in fact pursue the strategy of attempting to undermine Wilson's credibility, and that the deficiencies defendant alleges pertain primarily to tactical decisions counsel made in pursuit of that strategy. Just as we refrain from second-guessing trial strategy, see *Payne*, 285 Mich App at 190; we similarly decline to second-guess tactical decisions used to execute that strategy. That a chosen strategy proves unsuccessful is not grounds for an ineffective assistance claim. *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008). Moreover, even if counsel's cross-examination of Wilson had fallen below an objective standard of reasonableness under prevailing professional norms,

---

[8] A "Standard 4" brief refers to the brief a defendant may file in propria persona pursuant to Standard 4 of Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

-10-

defendant has not shown that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*, 466 US at 694. Without Wilson's testimony, the prosecution presented ample testimonial and forensic evidence that implicated defendant as one of the perpetrators of the charged crimes.

Defendant raises a number of additional ineffective assistance claims in his standard 4 brief. He first contends that his trial counsel provided ineffective assistance by failing to investigate the cell phones upon which the prosecution relied to place defendant at the scene of the crimes. He asserts that proper investigation would have shown that he did not take the picture of him with Bush that was on the Alcatel phone, but that Bush sent the picture to the phone, and that this would have undermined the notion that the Alcatel phone belonged to him. Contrary to defendant's expectation, there is no reasonable basis to believe that this discovery would have changed the outcome of the trial. The picture of Bush and defendant played no role in the prosecution's case against defendant, and it is not reasonable to infer that the Alcatel phone did not belong to defendant simply from the fact that Bush sent the photograph of her and defendant to the phone.

Defendant next contends that investigation of the phones would have revealed that defendant was not in Mount Clemens between 5:00 and 5:30 p.m. on the day of the robbery. Assuming for the sake of argument that defendant is correct, it would not undermine the prosecution's evidence that defendant was in Mount Clemens during the time of the robbery, and that texts between Waters and defendant, as well as Crigler's testimony, provided incriminating evidence of defendant's involvement in the robbery. Thus, even if further investigation of the cell phones revealed what defendant says it would, it is mere speculation that the result of the proceeding would have been different.

Next, defendant charges trial counsel with providing ineffective assistance by failing to cross-examine Markenya Crigler with questions that would have revealed that police manipulated and coerced her into accusing defendant of bringing stolen items to her house and that her anger at defendant motivated her to lie about defendant dropping off stolen items. This charge is without merit as our review of the record shows that defense counsel did indeed employ a strategy aimed at undermining Crigler's credibility. The jury was free to assess Crigler's credibility, weigh the evidence, and draw inferences from the evidence. See *People v Gillard*, 216 Mich 461, 470; 185 NW 734 (1921). That the jury did not arrive at the conclusions defendant thought it should does not mean that his attorney's performance was objectively deficient. See *Petri*, 279 Mich App at 412.

Defendant next asserts that trial counsel rendered ineffective assistance by failing to move for suppression of the evidence Det. Sgt. Stevens obtained outside of her jurisdiction and without informing local law enforcement. Assuming for the sake of argument that Det. Sgt. Stevens violated MCL 764.2a[9] by obtaining evidence outside her jurisdiction, a statutory

---

[9] MCL 764.2a sets forth the circumstances under which a county law enforcement officer may exercise the authority and power of her office outside the geographical boundaries of her county. None of those circumstances apply in the case at bar.

violation does not render police action unconstitutional. *People v Hamilton*, 465 Mich 526; 638 NW2d 92 (2002), abrogated on other grounds by *Bright v Ailshie*, 465 Mich 770; 641 NW2d 587 (2002). And absent a constitutional violation, the remedy for a statutory violation is not exclusion of the evidence. *People v Clark*, 181 Mich App 577; 450 NW2d 75 (1989) (holding that exclusion of the evidence is not appropriate where it is premised solely on a violation of MCL 764.2a, the purpose of which is to protect the rights and autonomy of local governments, not the rights of criminal defendants). In light of *Hamilton* and *Clark*, trial counsel did not render ineffective assistance by failing to raise a jurisdictional violation issue that would not have resulted in exclusion of the evidence. *Mack*, 265 Mich App at 130 (failing to advocate a meritless position does not constitute ineffective assistance).

Defendant also asserts that, given counsel's knowledge of the trial judge's bias, it was objectively unreasonable and prejudicial for counsel not to move for disqualification of the judge. A judge who is biased or prejudiced for or against a party may be disqualified, MCR 2.003(C)(1), upon a showing of actual bias or prejudice, *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009). Actual bias is "[g]enuine prejudice that a judge . . . has against [a defendant]." *Black's Law Dictionary* (10th ed), p 192. As evidence of the trial judge's actual bias, defendant offers a statement allegedly made by his counsel indicating that the judge thought he was guilty and ought to go to prison, the court's adverse rulings, and the length of his sentence. None of this is admissible evidence of actual bias. The statement defendant alleges of counsel is inadmissible hearsay, MRE 801(c); MRE 802, and the mere fact that the judge ruled against defendant is not a basis for disqualification, see *In re Contempt of Henry*, 282 Mich App at 680. In addition, defendant fails to cite any authority supporting his argument that a sentence within the recommended minimum guidelines shows bias. MCR 7.212(C)(7) (indicating that argument must be supported by citation to appropriate authority or policy). Because defendant has failed to establish grounds to disqualify the trial judge, his claim of ineffective assistance based on counsel's failure to seek disqualification of the judge fails.

Finally, defendant claims that trial counsel was ineffective for failing to object to the amount of restitution because it included property Wilson testified she had recovered. According to the PSIR, Wilson sought restitution for two hand guns, a bow and arrow, gold and diamond jewelry, cash, an Xbox 360 and five games, and the amount she had to pay to get her car out of impound. Defendant does not cite to the record in support of his claim that Wilson testified to recovering these items, nor did our scrutiny of the trial transcripts turn up such testimony. Thus, defendant has not established that trial counsel performed deficiently by failing to challenge the amount of restitution ordered. See *Mack*, 265 Mich App at 130.

## D. AMENDMENT OF DEFENDANT'S PSIR

Defendant contends that the trial court abused its discretion by declining his request to remove from his PSIR information regarding codefendants in an out-of-state conviction more than two decades old. We disagree. We review for an abuse of discretion a trial court's response to a defendant's challenge to the accuracy of a PSIR. *People v Uphaus*, 278 Mich App 174, 181; 748 NW2d 899 (2008). "A trial court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes." *Id*.

Defendant asked the trial court to delete from his PSIR information pertaining to a crime committed in Alabama more than 20 years ago. Relying on *People v Ericksen*, 288 Mich App 192, 206; 793 NW2d 120 (2010), the trial court explained: " 'it is well established that a PSIR may include information that would not be admissible at trial, including information about prior convictions as well as other criminal activity allegedly committed by the defendant.' " Accordingly, the trial court denied defendant's request for amendment.

On appeal, defendant asserts that the trial court relied on *Ericksen* for the proposition that a PSIR may contain only evidence that is admissible at trial. He then argues that the convictions of his Alabama codefendants, two of whom the Alabama court sentenced to death by electrocution for capital murder, would not have been admissible at trial, and he urges this Court to order amendment of the PSIR accordingly. Clearly, defendant has misread or misconstrued both the trial court's opinion and the governing law. *Ericksen* stands for the proposition that a PSIR may contain information "that would *not* be admissible at trial." *Ericksen*, 288 Mich App at 206 (emphasis added). *Ericksen* supports the trial court's decision, and defendant fails to cite any authority in support of his position. Therefore, we conclude that the trial court did not abuse its discretion by denying defendant's request for amendment of his PSIR.

## E. SHACKLING

Defendant contends that the evidence presented on remand established that he wore shackles during his entire trial, including during voir dire, and that the courtroom was so configured as to allow jurors to see his shackles. Because of this, defendant argues, his right to due process was violated and he is entitled to a new trial. If not a new trial, he is entitled at least to a second remand so the trial court can conduct *in camera* juror interviews to determine whether jurors saw defendant's ankle shackles, whether they discussed the shackles during deliberations, and whether the shackles influenced their verdict. We again disagree.

We review a trial court's decision to shackle a defendant for an abuse of discretion under the totality of the circumstances. *Payne*, 285 Mich App at 186. "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). Whether a defendant has been deprived of due process is a question of law subject to de novo review. *People v Odom*, 276 Mich App 407, 421; 740 NW2d 557 (2007). To establish a due process violation that requires reversal of a conviction, the defendant must prove prejudice to his defense. *People v McGee*, 258 Mich App 683 700; 672 NW2d 191 (2003).

"Freedom from shackling is an important component of a fair trial." *People v Dixon*, 217 Mich App 400, 404; 552 NW2d 663 (1996). "[A] defendant may be shackled only on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." *Payne*, 285 Mich App at 186 (internal quotation marks and citation omitted; alteration added). Absent individualized findings regarding the necessity of shackling defendant, the trial court abuse[s] its discretion by requiring defendant to wear shackles in the jury's presence. *Id*. at 186-187. "But even if a trial court abuses its discretion and requires a defendant to wear restraints, the defendant must show that he suffered prejudice as a result of the restraints to be entitled to relief." *Id*. at 186. The inability of the jury to see the restraints negates prejudice. *People v Horn*, 279 Mich App 31, 36; 755 NW2d 212 (2008). Even

if "jurors inadvertently see a defendant in shackles, there still must be some showing that the defendant was prejudiced." *Id*. at 37.

Our review of the record reveals no violation of defendant's due-process rights and, therefore, no error in the trial court's denial of defendant's motion for a new trial on constitutional grounds.[10]

On appeal, defendant relies primarily on the testimony of Deputy Sauger to support his contention that he wore ankle shackles during voir dire and that potential jurors sitting in the gallery could see the shackles. Although Deputy Sauger's testimony is at times confusing, viewed as a whole, it does not support a finding that defendant wore ankle shackles during voir dire or that jurors saw him in shackles at any time during the course of the trial. Deputy Sauger testified confidently that the jury must not see a defendant in shackles, that defendants were not shackled during voir dire if there was a chance that potential jurors in the gallery could see the shackles, and that he followed Deputy Haase's instructions. Deputy Haase testified unwaveringly that incarcerated defendants were unrestrained during voir dire. Thus, the testimony of these two deputies, viewed as a whole, provides no evidence that jurors saw defendant's ankle shackles.

Defendant relies on *People v Davenport* 488 Mich 1054; 794 NW2d 616 (2011) to contend that he is entitled to a remand to allow the court to conduct *in camera* interviews with his jurors to determine whether any saw him in shackles and, if they did, whether seeing his shackles affected their deliberations and decision. In our view, however, the Michigan Supreme Court's order in *Davenport* does not compel us to order a second remand of the case at bar. The Supreme Court remanded *Davenport* because this Court denied the defendant's motion for

---

[10] Based on the record before this Court, it is indisputable that the trial court abused its discretion by shackling defendant without making individualized findings supported by the record that shackling was necessary. *People v Payne*, 285 Mich App 181, 186; 744 NW2d 714 (2009). Trial courts are prohibited from routinely shackling defendants, *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994), and a law enforcement official's mere preference for the use of restraints is not a sufficient reason for shackling a defendant, *People v Banks*, 249 Mich App 247, 258; 642 NW2d 351 (2002). Shackling a defendant during trial is permitted only in extraordinary circumstances, *People v Dixon*, 217 Mich App 400, 404; 552 NW2d 663 (1996), such as to prevent the defendant's escape, to prevent him from injuring others in the courtroom, or to maintain an orderly trial, *Banks*, 249 Mich App at 257. The written policy of the Macomb County Sheriff regarding "prisoner transport, court and building security" accurately reflects this law, and the testimony of Deputy Haase on remand indicates his awareness of the policy. However, Deputy Haase's testimony also indicates that shackling incarcerated defendants is routine and that the trial court considered whether it was necessary only when there was an objection. This practice does not accord with Michigan law. Nevertheless, as egregious as this abuse of discretion is, it is not outcome determinative. There is no due-process violation or cause to reverse in the absence of prejudice, and defendant did not establish that shackling prejudiced his defense.

remand,[11] even though it was undisputed that defendant's left hand was chained to his waist throughout his trial, and video evidence showed that the shackles were visible.[12] After this Court affirmed the defendant's convictions, he applied for leave to appeal in the Supreme Court. In lieu of granting the defendant's application, the Supreme Court reversed this Court's decision and remanded the matter to the trial court to allow the defendant "to develop the record on the issue of whether his shackling during trial prejudiced his defense," *Davenport*, 488 Mich at 1054.

Unlike in *Davenport*, in the case at bar, this Court granted defendant's motion for remand to allow him to move for a new trial on the issue of whether jurors saw him in shackles. Thus, defendant has had the same opportunity to establish prejudice that the defendant in *Davenport* had on remand. The type of hearings conducted by the two trial courts responded to the issues raised on remand. In *Davenport*, as already indicated, it was undisputed that the defendant was shackled and that his shackles were visible, the only question was whether they were visible to the jury. Accordingly, the trial court conducted hearings in which jurors were asked if they saw the defendant's shackles and to what effect. On remand in the case at bar, the trial court held two evidentiary hearings to give defendant the same opportunity to establish that shackling prejudiced his defense. He was unable to do so. Now, defendant urges this Court to order a second remand for a different type of proceeding, even though he failed to establish on his first remand that his ankle shackles were visible during trial, let alone visible to jurors, potential or seated. Under these circumstances, *Davenport* does not compel us to grant a second remand to give defendant yet another opportunity to establish what he was unable to establish during the two evidentiary hearings the trial court conducted on the first remand.

## F. REMAINING STANDARD 4 ISSUES

Defendant raises several additional issues in his standard 4 brief, none of which compel reversal of his conviction.

### 1. INSTRUCTIONAL ERROR

Defendant argues that the trial court erred in granting the prosecution's request for an aiding-and-abetting instruction. Defendant asserts that the prosecution tried the case on the theory that defendant was present at the home invasion and robbery, but after the close of proofs, moved to include jury instructions on aiding and abetting under the theory that defendant was not at the victim's house, but directed the robbery from a remote location. Defendant argues that the consequence of the error was violation of his due-process right to have reasonable notice of the charges against him, and that the remedy is a new trial. We disagree. We review de novo both

---

[11] *People v Davenport*, unpublished order of the Court of Appeals, entered May 8, 2009 (Docket No. 287767).

[12] *People v Davenport*, unpublished per curiam opinion of the Court of Appeals, issued August 5, 2010 (Docket No. 287767), p 2.

instructional error, *People v Fennell*, 260 Mich App 261, 264; 677 NW2d 66 (2004), and whether defendant has been deprived of due process, *Odom*, 276 Mich App at 421.

Contrary to defendant's assertion, the prosecution did not request an aiding-and-abetting instruction on the theory that defendant directed the home invasion and armed robbery from afar. The prosecution based its request on evidence presented at trial that indicated that, although defendant was present at the scene of the crimes, his role in some of the charged offenses may have been indirect.

Michigan's court rules allow a party to "file a written request for jury instructions at or before the close of the evidence[,]" and to "submit its theory of the case regarding each issue" at the same time. MCR 2.512. "[W]hen a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge." *People v Mills*, 450 Mich 61, 81; 537 NW2d 909, mod 450 Mich 1212 (1995). A jury instruction on aiding and abetting is appropriate "where there is evidence that (1) more than one person was involved in committing a crime, and (2) the defendant's role in the crime may have been less than direct participation in the wrongdoing." *People v Bartlett*, 231 Mich App 139, 157; 585 NW2d 341 (1998). The prosecutor in the present case presented evidence at trial that there were three perpetrators and that defendant, although present at the scene of the crimes, may not have been the person who zip-tied Wilson's arms and duct taped her legs. The trial court did not err in instructing the jury in aiding and abetting because the evidence of multiple perpetrators and of defendant's less than direct participation in some aspects of the crime supported giving the instruction.

Defendant's reliance on decisions from the United States Supreme Court and from Michigan's Supreme Court to support his position is misplaced. The cases defendant relies on involve defendants charged with one crime or violation but convicted, or whose convictions were upheld, based on another crime or violation, or who were convicted on inadequate statements of the charges against them.[13] These cases involved charges for distinct crimes about which the defendants were not informed and against which they could not properly defend themselves. They are inapplicable here because aiding and abetting is not a distinct crime, see *People v Greaux*, 461 Mich 339, 344-345; 604 NW2d 327 (2000), but a theory of criminal liability, see *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006).

Defendant's assertion that his case is indistinguishable from *Smith v Lopez*, 731 F3d 859 (CA 9, 2013), rev'd by *Lopez v Smith*, __ US __; 135 S Ct 1; 190 L Ed 2d 1 (2014), is equally unavailing. The prosecution's theory in *Smith* was that the defendant acted alone in killing his wife. *Smith*, 731 F3d at 860-861. However, on cross-examination, one of the defendant's

---

[13] *Cole v Arkansas*, 333 US 196; 68 S Ct 514; 92 L Ed 644 (1948) (defendants convicted of violating one statute but their convictions were upheld based on violation of another statute); *Russell v United States*, 369 US 749; 82 S Ct 1038; 8 L Ed 2d (1962) (defendants charged with one crime but convicted of an uncharged lesser included offense); *People v Quinn*, 136 Mich App 145; 356 NW2d 10 (1984) (defendants convicted on inadequate indictments).

former employees admitted that he owed the defendant $15,000, knew the locations of several safes in the defendant's house, and knew details of the murder that investigators had not released. *Id*. at 863. In addition, the witness speculated that the defendant would not have committed the murder alone, and he named the person who might have helped the defendant. *Id*. After the close of proofs, the prosecutor successfully sought an aiding-and-abetting instruction. *Id*. at 863-864. In a general verdict, the jury convicted the defendant of first-degree murder as charged. *Id*. at 865. The California Court of Appeals eventually affirmed the conviction on state law grounds, finding that the aiding and abetting instruction was not prejudicial and did not "ambush" the defendant. *Id*. at 865-866. The California Supreme Court declined review. *Id*. at 866.

Subsequently, the defendant filed a federal habeas petition, arguing that "his constitutional right to adequate notice of the nature of the charges against him was violated when the trial court instructed the jury on aiding-and-abetting liability." *Id*. The federal district court granted Smith's petition, and the state appealed to the Ninth Circuit Court of Appeals. The Ninth Circuit affirmed the district court's grant of habeas, reasoning that "by requesting the jury instruction just before closing argument and without any prior indication that it was pursuing an aiding-and-abetting theory, the prosecution ambushed [the defendant] and denied him a meaningful opportunity to present his defense." *Smith*, 731 F3d 859 (2013).

Defendant contends that his case is indistinguishable from *Smith* and that the Ninth Circuit's reasoning should govern resolution of this issue. Defendant is incorrect. The United States Supreme Court reversed the Ninth Circuit's decision, holding that, absent a clear ruling from the nation's highest court, state law governed the issue of adequate notice. *Lopez v Smith*, __ US __; 135 S Ct 1; 190 L Ed 2d 1 (2014). As we have already explained, Michigan law supports the trial court's decision to give the aiding-and-abetting instructions.[14] See *Bartlett*, 231 Mich App at 157.

## 2. SUFFICIENCY OF THE EVIDENCE

Defendant next contends that, because the zip ties and duct tape did not restrict Wilson's movements, and because he did not forcibly confine Wilson in a way that interfered with her liberty, the evidence was insufficient to allow a juror to conclude beyond a reasonable doubt that he unlawfully imprisoned Brenda Wilson. Once again, we disagree. We review de novo a

---

[14] Even if the Ninth Circuit's decision remained good law, it would not govern our disposition of this case because of the significant facts that distinguish this case from *Smith*. In *Smith*, the prosecution presented no evidence that a party other than the defendant had committed the crime, presented no evidence of a connection between the defendant and the possible other party, and sought an aiding-and-abetting instruction on the strength of a witness' speculation about from whom the defendant might have had help. By contrast, in this case, the prosecution maintained from the beginning and presented evidence of multiple perpetrators and of defendant's indirect participation in some components of the incident.

defendant's challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

The test for determining the sufficiency of the evidence in a criminal case is whether the evidence, viewed in the light most favorable to the prosecution, would allow a rational trier of fact to conclude that the elements of the crime had been met beyond a reasonable doubt. *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). We resolve conflicts in the evidence in favor of the prosecution and "defer to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010) (quotation marks and citation omitted).

A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:

(a) The person is restrained by means of a weapon or dangerous instrument.

(b) The restrained person was secretly confined.

(c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony. [MCL 750.349b.]

As used in this statute, " '[r]estrain' means to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). In *People v Kosik*, 303 Mich App 146, 152; 841 NW2d 906 (2013), this Court found sufficient evidence for a rational jury to conclude beyond a reasonable doubt that the defendant secretly confined a victim where

[t]he victim was taken against her will into a conference room. She was held there in an enclosed area that was not visible to anyone who may have been passing by or in the store. Defendant was standing in front of the door to the conference room. If the victim had tried to escape, defendant was within arm's reach of her and could have prevented her from doing so. The victim testified that she was frightened by defendant.

In the case at bar, Wilson testified that a gunman forced her inside her home, ordered her into her living room, had her sit on her loveseat, and then instructed a co-perpetrator to zip tie her arms behind her back. While it is true that her hands came free from the zip ties, Wilson testified that she hid this fact from the robbers out of anxiety for what they might do if they discovered that her hands were free. Wilson said that defendant kept waving the gun around and threatening to kill her if she did not tell him what he wanted to know. At one point, the robbers left her alone in the living room, but it became clear that they meant her to stay put when one of them ordered another, "Go back in there and check on her." Defendant speculates that Wilson, a 68-year old grandmother, could have grabbed the gun the robbers left on a table and held the three men at bay, or used her phone to call police. But it is just as likely that such daring would have resulted in Wilson's injury. If one views the options available to Wilson at that time as "[c]onflicts in the evidence," this Court is required to resolve them in favor of the prosecution. *Bennett*, 290 Mich App at 472.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the elements of unlawful imprisonment were met beyond a reasonable doubt. *Hampton*, 407 Mich at 368. Either as the primary actor who held a gun to Wilson's neck and forced her into her home, into the living room, and onto a loveseat, or as an aider and abettor who ordered another to zip tie her hands, the evidence is sufficient to sustain defendant's conviction for unlawful imprisonment. Like the victim in *Kosik*, Wilson was forced into a space out of sight of anyone who could assist her and monitored to prevent her taking action adverse to the robbers.

### 3. RIGHT TO COUNSEL

Defendant contends that the trial court erred when it denied his trial counsel's request to withdraw and to provide substitute counsel on the ground that there had been a complete breakdown of the attorney-client relationship. Defendant is incorrect. We review a trial court's denial of an indigent defendant's request for the appointment of substitute counsel for an abuse of discretion. *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991). A trial court has not abused its discretion if its decision results in an outcome within the range of reasoned and principled outcomes. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013).

Substitute counsel is warranted only where "a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic" and where "substitution will not unreasonably disrupt the judicial process." *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991). Defendant's trial counsel explained to the court that the "relationship of trust and confidence between [defendant] and [his attorney] was lost forever" because defendant had filed a grievance against him with the Attorney Grievance Committee (AGC). Counsel said that there was a complete breakdown of the attorney-client relationship, that he and defendant no longer were on speaking terms, and that if convicted, defendant was certain to raise ineffective assistance of counsel claims against him and would probably bring a malpractice suit against him. Defendant told the court that he agreed with his attorney's trial strategy, but some of counsel's factual misstatements had caused him to lose trust in his attorney. In denying the motion to withdraw, the trial court did not find the grievance to be dispositive,[15] thought defendant's technical disputes about some of counsel's misstatements at oral arguments insignificant, and opined that counsel's withdrawal would disrupt the court's trial schedule. The trial court stated that it was not convinced that the dispute between defendant and his attorney was about trial tactics or strategy.

After reviewing the record, we agree with the trial court and conclude that its denial of defense counsel's motion to withdraw and for appointment of substitute counsel was not an abuse of discretion. Questions of professional judgment and trial strategy are matters entrusted to counsel and do not justify substitution of counsel, *People v Traylor*, 245 Mich App 460, 463; 628 NW2d 120 (2001), and here, defendant agreed with counsel's trial strategy. Defense

---

[15] The filing of a grievance does not establish good cause for the appointment of new counsel. *People v Strickland*, 293 Mich App 393, 397-398; 810 NW2d 660 (2011).

counsel did misspeak at the hearing on his motion for an eyewitness expert when he said that Wilson identified the robber who removed his mask briefly as defendant. However, nothing in the record indicates that the misstatement prejudiced defendant[16] or that trial counsel did not have a firm grasp of the relevant facts; thus, we agree with the trial court that counsel's misstatement was insignificant. Defendant's objection to counsel's factual inaccuracy does not constitute a "[g]enuine disagreement between counsel and the defendant over the use of a substantial defense or a fundamental trial tactic [that would] satisf[y] the good cause requirement . . . ." *People v Tucker*, 181 Mich App 246, 255; 448 NW2d 811 (1989), remanded on other grounds by *People v Musick*, 437 Mich 867 (1990). While it is true that defendant agreed with defense counsel that there had been a complete breakdown in the attorney-client relationship, defendant did not offer substantial reasons in support of this assertion. "[A] mere allegation that a defendant lacks confidence in his attorney, unsupported by a substantial reason, does not amount to adequate cause . . . ." *Tucker*, 181 Mich App at 255.

## 4. WARRANTLESS SEARCH

Defendant argues that evidence obtained from the Alcatel cell phone should be excluded because Det. Fraser and Deputy Cikota searched the phone prior to obtaining a search warrant and without a valid reason for violating the warrant requirement. Without the phone evidence, defendant argues, the jury arguably would not have convicted him. Defendant did not preserve this issue by seeking suppression of the allegedly tainted evidence in the trial court. *People v Metamora Water Svc, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007) ("For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court."). We review challenges of unpreserved constitutional error for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 752, 764; 597 NW2d 130 (1999).

Both the United States and Michigan Constitution guarantee against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. Generally, in the criminal context, a search conducted without a warrant is unreasonable, unless both probable cause and a circumstance establishing an exception exist. *People v Snider*, 239 Mich App 393, 406; 608 NW2d 502 (2000). One of the recognized exceptions to the warrant requirement is a search pursuant to consent. *People v Blasius*, 435 Mich 573, 582; 459 NW2d 906 (1990).

Defendant's contention that that Det. Fraser improperly searched his phone on December 17, 2014, is without factual support. Det. Fraser's undisputed testimony at the preliminary examination was that Bush gave him permission to look at her phone in order to see the phone number and name that was on it. Defendant claims to have attached to his standard 4 brief an affidavit in which Bush attested that Det. Fraser used her phone to call the Alcatel phone and then scrolled through the content of the Alcatel phone. We cannot identify any such document

---

[16] In fact, in the context of defendant's motion for an eyewitness expert, the misstatement may have provided added reason for the necessity of granting his motion.

among defendant's attachments.[17]  Thus, defendant has not shown that any improper search occurred.  Moreover, even if Det. Fraser did search the Alcatel phone without a warrant, defendant's remedy would be suppression of the evidence collected.  See *People v Stevens*, 460 Mich 626, 633-634; 597 NW2d 53 (1999) (indicating that the exclusionary rule operates to suppress the direct and indirect evidence obtained from an illegal search).  However, defendant does not identify any evidence illegally collected from the Alcatel phone that the trial court should have suppressed.

Defendant appears to assume that if Det. Fraser searched the Alcatel phone illegally, then all of the information extracted from the phone by Deputy Cikota and from the phone records by Duncan must be suppressed.  However, in order for the exclusionary rule to operate to suppress the information obtained by Deputy Cikota and by Duncan, the evidence must have been obtained directly or indirectly from Det. Fraser's alleged illegal search.  *Id*.  Defendant having failed to point to any evidence obtained from the Alcatel phone by Det. Fraser's alleged search, to claim that the information obtained by Deputy Cikota and by Duncan is fruit of Det. Fraser's poisonous search merely heaps conjecture on top of speculation.

Finally, defendant does not support his assertion that Deputy Cikota analyzed the phones on December 18, 2014, prior to obtaining a search warrant with documentary evidence or citations to the record.  Det. Fraser testified that members of the crime unit team wrapped up at around 2:00 or 3:00 a.m. on the morning of December 18, 2014, and returned to work at around 8:00 a.m. the same morning, at which point "[s]earch warrants were drafted, signed, and the phones were turned over to Deputy Cikota."  Given the deputy's undisputed testimony, and absent evidence substantiating defendant's claim, there is no basis for concluding that Deputy Cikota violated the warrant requirement when he extracted information from defendant's phone.  Because defendant has not established plain error, his claim of a constitutional violation arising from an improper search of his cell phone fails.

### 5.  EXCULPATORY EVIDENCE AND FALSE TESTIMONY

Finally, defendant argues that the prosecution committed a *Brady* violation by failing to disclose to the defense exculpatory evidence pulled from the cell phones confiscated from defendant and Taija Bush.  Defendant claims that the evidence would have shown that the phones were not in Mount Clemens from 3:00 to 5:30 p.m. on the day of the robbery, thus further undermining Wilson's identification testimony.  He also claims that further investigation would have revealed that police transferred a photograph of Bush and him from Bush's phone to the Alcatel phone to make it look like defendant owned the phone and had made the incriminating text messages found on the phone.  In addition, defendant contends that the prosecution failed to disclose that police searched the electronic content of the phone they

---

[17] Defendant either failed to attach the affidavit or attached an illegible document.  Either way, defendant has not properly shown that Fraser improperly searched his cell phone.  The coversheet to the attached documents states that defendant's appellate attorney filed them electronically.  Thus, any omission or error in scanning was defendant's, not the Court's.

confiscated from defendant before obtaining a search warrant. Defendant contends that had the prosecution revealed this evidence, it would invariably have led to a successful motion to suppress the evidence. We review these unpreserved issue for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 762; 597 NW2d 130 (1999).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In order to establish a *Brady* violation, defendant must prove that: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*.

> To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v Bagley, 473 US 667, 682; 105 S Ct 3375, 87 L Ed 2d 481 (1985). [*Chenault*, 495 Mich at 150.]

Assuming for the sake of argument that the phone records contained evidence favorable to defendant because it could have impeached Wilson's credibility, defendant has not shown that the evidence was material. See *Chenault*, 495 Mich at 150-151. Materiality asks whether, "in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 150-151 (quotation marks and citation omitted). Here, even without Wilson's identification testimony, the prosecution presented compelling evidence of defendant's guilt. Crigler's testimony, supported by recovery from her apartment of items stolen from Wilson, the phone record evidence, and Truxell's testimony regarding contact with Bush at the time and in the vicinity of the crime supports the conclusion that defendant committed the charged crimes and renders the verdict worthy of confidence. Defendant's claim that police transferred a photograph of him and Bush to the Alcatel phone to incriminate him is utterly without merit.

Defendant also asserts that he is entitled to a new trial because the prosecution violated his right to due process by knowingly presenting false testimony from Brenda Wilson and Det. Fraser. Regarding Wilson, defendant claims that a police report of the incident states that Wilson said she saw defendant from her mother's kitchen window at around 7:30 p.m., but the prosecutor allowed her to testify falsely at the preliminary examination and at trial that she saw him between 3:00 and 5:30 p.m. With regard to Det. Fraser, defendant alleges that the prosecutor failed to correct his testimony that he confiscated a phone from defendant, secured it as evidence, and then turned it over to Deputy Cikota, when in fact the detective searched through the phone prior to obtaining a warrant.

In light of our rejection of defendant's assertion that Det. Fraser illegally searched defendant's cell phone, we find no merit in his argument here. Regarding his claims about Wilson's testimony, regardless of what appears in an unsworn police report from the night of the incident, Wilson testified consistently under oath that she saw defendant seated in an unfamiliar

car parked across the street from her mother's house at around 5:00 to 5:30 p.m., while it was still somewhat light outside. Nothing in the record refutes this; there is no indication that street lights were on (or were malfunctioning), and Randy Wilson testified that he could not see the three people who walked within 10 feet of him not because it was dark, but because they had pulled hoods up over their heads. Given these circumstances, the prosecutor had no reason to believe that Wilson's sworn testimony was untruthful and in need of correction.

Affirmed.

/s/ Jane M. Beckering
/s/ Michael J. Kelly
/s/ Colleen A. O'Brien